## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ALEXA RHEY SHARPE, | CASE NO. 1:20-CV-02732-PAG |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Alexa Rhey Sharpe filed a complaint against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision denying an award of child's disability insurance benefits . (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 8, 2020, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Sharpe filed for  child's disability insurance benefits on February 12, 2019, alleging a disability onset date of February 25, 1999. (Tr. 55-56). Her claims were denied initially and on

reconsideration. (Tr. 55-63, 66-73). She then requested a hearing before an Administrative Law

Judge. (Tr. 91-92). Ms. Sharpe (represented by counsel), and a vocational expert (VE) testified at a

hearing before the ALJ on April 22, 2020. (Tr. 34-54). On May 1, 2020, the ALJ issued a written

decision finding Ms. Sharpe not disabled. (Tr. 14-30). The Appeals Council denied Ms. Sharpe's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5;

*see* 20 C.F.R. §§ 404.955, 404.981). Ms. Sharpe timely filed this action on December 8, 2020.

(ECF #1).

## Factual Background

### I.    Administrative Hearing

The following summarizes the testimony of Ms. Sharpe and VE Robert Mosely, Ph.D.,

presented during the hearing before the ALJ.

Ms. Sharpe testified she has autism, and it debilitates her in certain situations, such as

interacting with people on a regular basis. (Tr. 42). Ms. Sharpe testified she gets upset when she

experiences new things and does not know how to process the experience. (Tr. 47). Her autism

sometimes manifests itself in a fear of asking for help. (Tr. 47). Due to her fear of asking for help,

she sometimes will not finish a task she started. (Tr. 47-48).

Ms. Sharpe stated she was 25 years old at the hearing and had obtained a high school

diploma but had not attempted college or vocational training. (Tr. 41). In high school, Ms. Sharpe

had been mainstreamed in regular classes and did not require special education classes. (Tr. 41-42).

Ms. Sharpe testified she lives with her stepfather. (Tr. 42). He helps with transportation

and getting things she needs for the house, but does not provide her special assistance. (Tr. 45).

Ms. Sharpe assists her stepfather with chores around the house, such as keeping the house

organized. (Tr. 45). She interacts with her aunt on a weekly basis and has a boyfriend she talks to daily, but rarely interacts with other people, even online. (Tr. 41.). Ms. Sharpe testified she does not have trouble learning tasks, but her social limitations make it difficult to interact with people and ask clarifying questions when learning how to perform a job. (Tr. 44).

Ms. Sharpe does not go places alone, but will go to the store with her stepfather. (Tr. 44.) She previously received services from an autism coach, who taught Ms. Sharpe independent living skills and how to advocate for herself. (*Id.*). Ms. Sharpe felt she had learned a lot from the autism coach and had improved over the past year. (Tr. 44-45). However, at the time of the hearing, Ms. Sharpe had been unable to meet with her autism coach due to COVID-19 pandemic-related restrictions. (Tr. 44).

VE Mosley then testified. The ALJ presented the following hypothetical: an individual who could work at all exertional levels, but who can only understand, remember, and carry out simple, repetitive instructions in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production-rate pace; work does not require more than superficial interaction (meaning it does not require negotiating with, instructing, persuading, or directing the work of others); and the occupation does not require tandem work or interaction with the public. (Tr. 49-50).

The VE provided three job examples such a hypothetical individual could perform:

- Cleaner, housekeeping (DOT #313.687-014): light, unskilled, SVP 2, over 200,000 jobs nationally;[1]

---

[1]     "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d). "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

- Dining room attendant (DOT #311.677-018): medium, unskilled, SVP 2, over 200,000 jobs nationally;

- Cleaner II (DOT #919.687-014): medium, unskilled, SVP 2, 100,000 jobs nationally.

(Tr. 50).

The ALJ presented a second hypothetical with the same restrictions as above, except the hypothetical individual would be off-task twenty percent of the time. (Tr. 50-51). The VE testified such an individual would not be able to retain or maintain employment in any job. (Tr. 51).

The ALJ's final hypothetical was a worker who would be absent two times per month on an ongoing basis. (*Id.*). The VE testified such an individual would also be unable to maintain or retain employment. (*Id.*).

Ms. Sharpe's attorney then questioned the VE, asking if a hypothetical individual would be employable if the individual was unable to ask a supervisor for assistance when needed. (Tr. 52). The VE responded this limitation would likely result in the employee being off task, and the individual would be unemployable if that off-task behavior resulted more than fifteen percent of the time or resulted in lost production fifteen percent of the time. (*Id.*).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Sharpe applied for child's disability child's insurance benefits based on the wages of her mother, Jennifer Ann Preslan. (Tr. 55). Ms. Sharpe was 4 years old at the time of her alleged onset date, and 25 years old at the time of the administrative hearing. (Tr. 41, 55). Ms. Sharpe completed high school and obtained a high school diploma. (Tr. 41). Ms. Sharpe has never worked and therefore does not have past relevant work. (Tr. 28).

4

III.    RELEVANT MEDICAL EVIDENCE

**Rainbow Babies & Children's Hospital.** Ms. Sharpe was diagnosed with autism spectrum disorder at age three. (Tr. 224). The Children's Developmental Center assessed Ms. Sharpe as falling within the mild-moderate range on the Childhood Autism Rating Scale. (*Id.*).

At four years old, she was evaluated by Max Wiznitzer, M.D., at the Rainbow Babies & Children's Hospital, in the University Hospitals Health System. (Tr. 224-26). Ms. Sharpe was described as having echolalia[2] and frequently repeated video and television scripts. (Tr. 225). Ms. Sharpe did not use language socially, but was able to convey information. (*Id.*).

During the office visit with Dr. Wiznitzer, Ms. Sharpe was aloof, but would interact with the doctor if he approached her and would reach out to her mother for comfort. (*Id.*). Ms. Sharpe was obese, but her weight was being managed by Dr. Douglas Kerr. (*Id.*). Dr. Wiznitzer agreed with the Children's Developmental Center's diagnosis of autism spectrum disorder. (*Id.*). Dr. Wiznitzer noted an obvious improvement in Ms. Sharpe's ability to interact and communicate effectively since age two. (*Id.*). However, Ms. Sharpe was not functioning at an age-appropriate level. (*Id.*). Dr. Wiznitzer recommended Ms. Sharpe receive educational programming and doing "homework" to encourage language and developmental skills. (Tr. 226). Dr. Wiznitzer recommended follow-up in one year to monitor Ms. Sharpe's progress and determine whether additional interventions were necessary. (*Id.*).

---

[2]    Echolalia is the repetitive echoing of utterances made by others. Kamakshya P. Patra and Orlando De Jesus, *Echolalia*, NCBI (February 19, 2022), https://www.ncbi.nlm.nih.gov/books/NBK565908/. It is a speech disturbance characteristically described in children with autism spectrum disorder and is a non-voluntary, automatic, and pervasive behavior. *Id.*

**Educational Records.** Ms. Sharpe had an Individualized Education Program (IEP) during school. (*See, e.g.*, Tr. 311, 320-33). With the specialized support provided by the IEP, Ms. Sharpe performed well in school. (*See* Tr. 265, 271, 296, 312-13, 328). Despite standardized test scores showing receptive and expressive language skills in the average range, Ms. Sharpe's teachers noted she would not speak up, kept to herself, and did not work well in groups. (*Compare* Tr. 297 *with* Tr. 263, 266, 269, 272). Her teachers indicated Ms. Sharpe needed more self-confidence ("realize that making a mistake is part of learning") but could complete class material with additional encouragement and taking the time to understand directions. (Tr. 304-11).

Ms. Sharpe demonstrated difficulty understanding abstract concepts and figurative language. (Tr. 305, 310). Ms. Sharpe did not always understand directions the first time, particularly verbal directions, but was fine once she received additional instruction. (Tr. 305-06). Ms. Sharpe would not initiate social greetings and exhibited difficulty initiating, joining, and ending conversations, suggesting Ms. Sharpe was not open to making friends. (Tr. 277). Ms. Sharpe demonstrated difficulty asking for help and did not complete her homework. (*Id.*). Even so, Ms. Sharpe was able to be mainstreamed during school and seldom needed help or support. (Tr. 270, 293, 296, 299, 310).

In 2007 at age 12, Ms. Sharpe obtained a Full-Scale Intelligence Quotient score of 99; testing indicated her cognitive abilities were consistent with an average range of functioning. (Tr. 280, 294-95, 310). Her performance in reading fluency, reading comprehension, and math computation skills were consistent with grade-level functioning. (Tr. 280, 310). Ms. Sharpe exhibited significant deficits in nonverbal communication skills and social interactions, consistent with her diagnosis of autism spectrum disorder. (Tr. 284).

The school psychologist, Rose Hill, Psy. S., noted Ms. Sharpe was rated in the Clinically Significant range for anxiety, atypicality, and withdrawal, suggesting a high level of maladjustment. (Tr. 300). Ms. Sharpe was rated as At-Risk for somatization (conversion of anxiety into physical symptoms), internalizing, behavioral symptoms, functional communication, and developmental social disorders, suggesting significant problems that may not be severe enough for formal intervention or a potential problem requiring careful monitoring. (*Id.*). Dr. Hill identified target behaviors for intervention, including: waiting to take her turn, annoying others on purpose, refusing to join group activities, speaking in short phrases that are hard to understand, communicating clearly, and interrupting others. (Tr. 301).

Ms. Sharpe self-reported she could complete chores and make simple meals if she had to live on her own, but would need help with bills. (Tr. 278). She had taken a course in home economics. (Tr. 278, 322). Ms. Sharpe improved in her clinically-significant behaviors (such as oppositional or limited interactions) as she matured. (Tr. 279). Ms. Sharpe's adaptive skills were within the average range. (Tr. 299).

## IV.   MEDICAL OPINIONS

**Psychological Evaluation.** On October 9, 2012, at age 17, Ms. Sharpe underwent a psychological evaluation conducted by Thomas Zeck, Ph.D. (Tr. 315-19). Dr. Zeck recorded Ms. Sharpe's diagnosis as Asperger's, but recorded no other health problems. (Tr. 315). Dr. Zeck noted Ms. Sharpe had been in special education classes in first and second grade and mainstreamed from third grade through ninth grade; at the time of the evaluation, Ms. Sharpe was in the eleventh

grade and enrolled in Electronic Classroom of Tomorrow (ECOT). (Tr. 316).[3] Ms. Sharpe was 5'8"

tall and weighed over 200 pounds. (*Id.*). At the evaluation, Ms. Sharpe reported her weight was a

sensitive issue and she had been unable to lose weight despite efforts. (*Id.*).

Ms. Sharpe reported being depressed and described a past failed suicide attempt. (Tr. 317).

She was tense and anxious during the interview. (*Id.*). Ms. Sharpe endorsed feelings of helplessness

and hopelessness, and had crying spells on a weekly basis. (*Id.*). Ms. Sharpe described feelings of

guilt due to her mother dying (from an infection), although Ms. Sharpe was reassured there was

nothing she could have done to prevent her mother's death. (Tr. 315, 317). Dr. Zink noted Ms.

Sharpe would benefit from counseling. (Tr. 317).

In her cognitive function tests, Ms. Sharpe was able to count backwards from 20 and could

do serial 3's. (*Id.*). She was unable to complete serial 7's and became confused. (*Id.*). Ms. Sharpe

could not interpret any of the proverbs provided to her. (*Id.*). Ms. Sharpe was average in

concentration, rote memory, immediate recall, and mental arithmetic reasoning. (*Id.*). Ms. Sharpe

was high average in abstract and logical thinking. (*Id.*). Ms. Sharpe's responses to hypothetical

judgment situations placed her in the borderline range for insight and judgment. (Tr. 317).

In the interview, Ms. Sharpe stated she could probably work, but would need additional

coaching and support in adjusting to a work setting. (Tr. 318). Ms. Sharpe's aunt and

grandmother, however, feel Ms. Sharpe would not be able to function on her own due to anger

issues and temper tantrums. (*Id.*). Ms. Sharpe's coping skills and social skills are problematic for

her. (*Id.*).

---

[3]     Early on, Ms. Sharpe related well to her peers and teachers, but after she began having
problems with other students, she transferred from Elyria High School to ECOT. (Tr. 316).

Dr. Zeck assessed Ms. Sharpe as having functional abilities similar to typically developing children of the same age. (Tr. 319). Ms. Sharpe did well on cognitive testing and was at least within the average range in most areas. (*Id.*). Ms. Sharpe's primary problem was in interacting and relating with others. (*Id.*). Dr. Zeck indicated Ms. Sharpe was able to manage these problems through her online schooling, where she was able to complete tasks on her own schedule and without her peers making fun of her. (*Id.*).

**State Agency Reviewers.** On May 6, 2019, Karla Delcour, Ph.D., reviewed Ms. Sharpe's records at the initial level and found there was insufficient evidence in her file from age 18 to 22 (2013 through 2017) to evaluate Ms. Sharpe's impairments and their impact on her functioning. (Tr. 60-61). Ms. Sharpe was therefore determined not disabled and her claim was denied. (Tr. 62).

No new evidence was received at the reconsideration level to show any alleged changes or worsening in Ms. Sharpe's condition. (Tr. 70). Lisa Faulk, Psy.D., concurred with Dr. Delcour on July 15, 2019. (Tr. 70-71). Ms. Sharpe was again determined not disabled. (Tr. 72).

V.    OTHER RELEVANT EVIDENCE

**Personal Coach.** Ms. Sharpe received personal coaching services from Kelly Bylewski for autism from August through November 2019. (Tr. 205-22). Ms. Bylewski assisted Ms. Sharpe with goals such as setting boundaries with her boyfriend, attending public events, obtaining her temporary driver's license, and navigating family relationships. (Tr. 205-07, 213-15). Ms. Bylewski assisted Ms. Sharpe in learning structured independent living skills so she could live independently. (Tr. 217). Ms. Bylewski indicated Ms. Sharpe should assist her stepfather in taking care of taxes, bills, etc., so that Ms. Sharpe could practice tracking and knowing how to pay bills. (Tr. 217-19).

Ms. Bylewski assisted Ms. Sharpe in volunteering at Oberlin Community Services Center, a local food pantry. (Tr. 207-08). After the volunteer session, Ms. Bylewski noted improved confidence from Ms. Sharpe and that Ms. Sharpe was able to follow directions and become more efficient as the day progressed. (Tr. 208). Ms. Bylewski stated, "[Ms. Sharpe] can work, but her social anxiety has not allowed her to do so up to this point. She can do this with practice and repetition." (*Id.*). The next month, Ms. Sharpe was able to start and finish volunteer sessions at the food pantry on her own; Ms. Bylewski joined her halfway through a volunteer shift. (Tr. 209).

Ms. Sharpe completed eligibility testing at the developmental disabilities board and did "exceptional" in six out of the seven tested areas. (Tr. 219). Ms. Sharpe was learning, retaining, and understanding road signs and driving laws; Ms. Sharpe planned to take her driving test for her temporary license between Thanksgiving and Christmas of 2019. (Tr. 220). Ms. Bylewski noted Ms. Sharpe continued to improve in her goal of becoming more independent. (Tr. 220-21).

**Third-Party Function Report.** Ms. Sharpe's stepsister, Shelly Preslan, completed a third-party function report on March 15, 2020. (Tr. 197). Ms. Preslan noted Ms. Sharpe "gets worried about being around other people" and will yell and throw things. (*Id.*). According to Ms. Preslan, Ms. Sharpe does not drive and prefers to be alone. (*Id.*). Ms. Preslan described the chores Ms. Sharpe is able to complete around the home, including feeding the family's dogs and cats, cleaning the cat box, making coffee and breakfast, cooking meals, and cleaning the house. (Tr. 198-99). Ms. Sharpe volunteered at a food bank. (Tr. 201).

Ms. Preslan described Ms. Sharpe as having difficulty learning and being most comfortable alone. (Tr. 200). Ms. Preslan indicated Ms. Sharpe would not be able to pay bills. (*Id.*). Ms. Preslan marked that Ms. Sharpe has difficulty in understanding and getting along with others; she stated

10

Ms. Sharpe needs things explained in different ways, and strangers make her feel as if people hate her. (Tr. 202). According to Ms. Preslan, Ms. Sharpe handles changes in routine "pretty well." (Tr. 203).

## THE ALJ'S DECISION

The ALJ's decision, dated May 1, 2020, included the following findings of fact and conclusions of law:

1.  Born on February 22, 1995, the claimant had not attained age 22 as of February 25, 1999, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).

2.  The claimant has not engaged in substantial gainful activity since February 25, 1999, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  Prior to attaining age 22, the claimant had the following severe impairments: autism spectrum disorder and depressive disorder (20 CFR 404.1520(c)).

4.  Prior to attaining age 22, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, prior to attaining age 22, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and carry out simple, repetitive instructions in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace; the work does not require more than superficial instruction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require tandem work or interaction with the public.

6.  The claimant has no past relevant work (20 CFR 404.1565).

7.  The claimant was born on February 22, 1995 and was 4 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564).

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.  Prior to attaining age 22, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to February 21, 2018, the date she attained age 22 (20 CFR 404.350(a)(5) and 404.1520(g)).

(Tr. 17-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence

also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). Disabled child benefits are available for claimants who are 18 years old or older and have a disability that began before attaining age 22. 20 C.F.R. § 404.350(a)(5). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a);

*see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—

found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity ("RFC") to perform available

work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past

work experience to determine if the claimant could perform other work. *Id.* Only if a claimant

satisfies each element of the analysis, including inability to do other work, and meets the duration

requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127

F.3d at 529.

<h2 style="text-align:center">DISCUSSION</h2>

Ms. Sharpe presents two issues for review:

1.  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers; as such, the ALJ's decision in Ms. Sharpe's case was constitutionally defective; and

14

      2.      The ALJ committed harmful error because the RFC did not consider the effect of the combination of Ms. Sharpe's severe impairments on her ability to engage in substantial gainful activity on a sustained basis.

(Pl.'s Br., ECF #14, PageID 422). The Commissioner concedes that Andrew Saul's appointment may have been constitutionally defective, but asserts this alleged defect has no bearing on Ms. Sharpe's case. (Comm'r's Br., ECF #18, PageID 477-78). The Commissioner reasons that because the ALJ who decided Ms. Sharpe's case was appointed by an *Acting* Commissioner of Social Security, there is no separation-of-powers violation. (*Id.* at PageID 477). The Commissioner further asserts that substantial evidence supports the ALJ's Step Three and RFC findings. (*Id.* at PageID 489-98). I agree with the Commissioner, and therefore recommend the District Court affirm the Commissioner's decision for the reasons that follow.

## I.    **Ms. Sharpe's constitutional challenge fails.**

Ms. Sharpe first argues for remand because Andrew Saul, the former Commissioner of the Social Security Administration (SSA), was unconstitutionally appointed, making SSA's very structure unconstitutional. (Pl.'s Br., ECF #14, PageID 428). Ms. Sharpe further claims she is entitled to a *de novo* hearing because the ALJ who decided her case, Eric Westley, derived his authority from the unconstitutionally appointment of Commissioner Saul, meaning ALJ Westley's ability to make findings of fact and issue a final decision was constitutionally defective. (*Id.* at PageID 429).

The Commissioner concedes that former Commissioner Saul's appointment violated the separation of powers and was constitutionally defective (Comm'r's Br., ECF #18, PageID 477). In that regard, we are all agreed. But without more, there is no basis to recommend setting aside ALJ Westley's decision in this case.

**A.     Ms. Sharpe has not forfeited her ability to challenge the constitutionality of Commissioner Saul's appointment.**

As a threshold matter, I conclude Ms. Sharpe has not forfeited her ability to raise her constitutional challenge. (*See* Pl.'s Br., ECF #14, PageID 429). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. However, this rule does not change Sixth Circuit precedent (*see Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537 (6th Cir. 2020)), nor does it change the claimant's requirement to raise the issue in the opening brief or else waive the claim. *Kathrine R. v. Kijakazi*, No. 2:19-CV-00334-FVS, 2021 WL 3854431, at *3-4 (E.D. Wash. Aug. 27, 2021) (finding that *Carr* did not change existing precedent that claimant could have, but did not, raise an Appointments Clause claim in her opening brief, and thus declining to amend or alter judgment).

I therefore proceed to address the merits of Ms. Sharpe's constitutional argument.

**B.     Because Ms. Sharpe has not shown a specific, personal harm, she is not entitled to a remand under *Seila Law* or *Collins v. Yellen*.**

Andrew Saul became Commissioner of SSA on June 17, 2019, pursuant to 42 U.S.C. § 902(a). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* Recent Supreme Court cases have held that similar clauses pertaining to other administrative agency heads are unconstitutional violations of the separation of powers. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency only for "inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional); *see also Collins v. Yellen*,

16

141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency "for cause" or "neglect of duty, or malfeasance in office" violates the separation of powers and is unconstitutional). As such, § 902(a)(3) may also violate the separation of powers because it limits the President's authority to remove the Commissioner without cause. *See Seila Law LLC*, 140 S. Ct. at 2197; *Collins*, 141 S. Ct. at 1787-89.

Ms. Sharpe and the Commissioner disagree on the effect, if any, the acknowledged unconstitutional removal restriction of § 902(a)(3) has on Ms. Sharpe's disability application. Ms. Sharpe argues she is entitled to remand for a *de novo* hearing. (Pl.'s Br., ECF #14, PageID 429). The Commissioner disagrees, asserting Ms. Sharpe has not shown the unconstitutional removal restriction caused the denial of her claim, among other considerations. (Comm'r's Br., ECF #18, PageID 476-83).

In *Seila Law*, the Supreme Court determined that a single agency head—in that case, the Consumer Financial Protection Bureau (CFPB)—who can only be fired for cause violates the "take care" clause of Article II, Section 1, clause 1 of the U.S. Constitution. *Seila Law, LLC*, 140 S. Ct. at 2197. For the President to execute fully the "take care" duties, the President must be able to fire the agency head at-will. *Id.* Therefore, agencies led by a single director cannot be fully independent; rather, they must be subject to the President's constitutional duty to control federal officers who assist the President in executing federal law. *Id.* at 2197-2207. *Seila Law* further found the offending clause was severable from the other portions of its Act, thereby maintaining CFPB intact as an agency. *See* 140 S. Ct. at 2208, 2211.

*Collins v. Yellen* raises the follow-on question of what remedy, if any, is available to claimants who succeed in a constitutional challenge to an agency's structure. 141 S. Ct. at 1787-89.

As with *Seila Law*, the Federal Housing Finance Agency (FHFA) faced a challenge based in the Appointments Clause. The FHFA had "modest restrictions" on the President's ability to fire the head of the single-director-led agency. *Id.* at 1787. *Collins* further stated that the removal-power principle applies at all levels within the Executive Branch: "At-will removal ensures that the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Id.* at 1784. The Court concluded the appointment was unconstitutional for the same reasons as in *Seila Law* and remanded the case with the instruction that the lower courts determine the appropriate remedy. *Id.* at 1770, 1789.

But even if these challenges to agency structure were extended to the SSA's structure, *see Seila Law*, 140 S.Ct. 2202, it does not necessarily follow that remand is required in an individual claimant's case. As the Court explained in *Collins*, the unconstitutionality of a removal provision does not strip an agency head of the authority to carry out the other functions of the office. *Collins*, 141 S. Ct. at 1788; *see also id.* at n.23 ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .") (citing *Seila Law*, 140 S. Ct. at 2207-11). Instead, to obtain remand, the claimant must demonstrate "compensable harm" flowing from the unconstitutional removal clause. *See id.* at 1788-89. Indeed, it is a difficult task for a claimant to show how the removal provision the President holds over the Social Security Commissioner affects the decision of an ALJ or the Appeals Council in their particular case. *Id.* at 1802 (Kagan, J. concurring) ("Consider the hundreds of thousands of decisions that the [SSA] makes each year. . . . But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone.").

18

Ms. Sharpe asserts the government deprived her of a valid administrative process, because only the Commissioner may make findings of fact and issue final decisions as to benefit eligibility. (Pl.'s Br., ECF #14, PageID 428). In Ms. Sharpe's view, because the ALJ's authority was delegated from the Commissioner, and because the Commissioner's authority was unconstitutional, the ALJ's ability to make findings of fact and issue a decision was also constitutionally defective. (*Id.*).

This assertion appears to conflate issues that might have flowed from the allegedly unconstitutional *removal* provision with former Commissioner Saul's *appointment* more generally, inferring that the ALJs underneath Commissioner Saul also served unconstitutionally. (*Id.*; *see also* Pl.'s Reply Br., ECF #19, PageID 501-05). Ms. Sharpe also provides examples of changes to the HALLEX manual regarding hearing notices and changes to the evaluation of musculoskeletal impairments promulgated by former Commissioner Saul. (Pl.'s Reply Br., ECF #19, PageID 503) (stating, in part, "Also, while Commissioner, Social Security modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015). These are examples of the policy implementation by Mr. Saul which impacted Plaintiff and her application of benefits.").[4] Ms. Sharpe also extends the allegation of constitutional defect to the entirety of  SSA. (Pl.'s Br., ECF #14, PageID 428) ("Since Andrew Saul was likewise not dependent on the President, SSA's structure is also unconstitutional.").

But *Seila Law* and *Collins* demonstrate that appointments are not nullified by an unconstitutional removal provision. Nor would the defective appointment of an agency head implicate the constitutionality of every decision rendered by agency officials. Moreover, Ms. Sharpe

---

[4]    I note, however, Ms. Sharpe has no musculoskeletal impairments and otherwise describes no harm particular to her arising from any policy changes former Commissioner Saul implemented.

does not address the fact that the specific ALJ who presided over her case—Judge Westley—was not appointed by a Commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* Comm'r's Br., ECF #18, PageID 477). Because Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (noting that FHFA's *Acting* Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between Acting Commissioner Berryhill's ratification of Judge Westley's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Ms. Sharpe has not shown that Acting Director Berryhill or Judge Westley lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the

20

other responsibilities of his office . . . "). Without such nexus, Ms. Sharpe has not shown she is entitled to a *de novo* hearing under *Collins*. *Id.* at 1787.

Other federal courts in this judicial district, this state, and across the country, have concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I also decline to recommend remand on this basis.

Because Ms. Sharpe has not articulated a specific, personal harm she sustained as a result of the unconstitutional removal provision in § 902(a)(3), her constitutional challenge fails.[5]

## II. Substantial evidence supports the ALJ's Step Three determination that Ms. Sharpe had no more than moderate functional limitations. [6]

Ms. Sharpe argues the ALJ's Step Three findings of only moderate limitations in Paragraph B criteria are not supported by substantial evidence. (Pl.'s Br., ECF #14, PageID 430-34). She

---

[5]     Given this determination, it is unnecessary for me to address the Commissioner's alternative arguments opposing Ms. Sharpe's constitutional challenge (harmless error doctrine, de facto officer doctrine, rule of necessity, and broad prudential considerations). (Comm'r's Br., ECF # 21, PageID 484-89). *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher v. Comm'r of Soc. Sec*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 (S.D. Ohio Dec. 21, 2021) ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations."), *report and recommendation adopted*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

[6]     Ms. Sharpe presents her arguments in the context of a challenge to the ALJ's RFC determination. Contained within this merits argument, however, Ms. Sharpe advances in a cursory and confusing manner a number of issues not particular to the RFC determination. Although I attempt to address those issues that have been fairly argued, I decline to present and decide issues that Ms. Sharpe has not adequately raised. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.

asserts the ALJ cherry-picked the evidence, and offers evidence purportedly not considered by the ALJ to demonstrate that, in combination, she meets the "extreme" limitations required by the Paragraph B criteria. (*Id.*). The Commissioner responds the ALJ "engaged with the evidence on which [Ms. Sharpe] relies and more, and indeed provided more robust analysis of the record than [Ms. Sharpe] now does," and requests the Court affirm because substantial evidence supports the decision. (Comm'r's Br., ECF #18, PageID 495-96). I agree with the Commissioner: the ALJ provided an analysis of the record sufficient to guide this Court's review, and the decision is supported by substantial evidence.

The Step Three analysis centers on the medical severity of a claimant's impairment and whether a claimant meets a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairments meet or equal a listing, the ALJ must find the claimant disabled at Step Three and will not continue in the sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4); *see also Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If a claimant's impairment does not meet the criteria for a listed disability, the ALJ proceeds to the next step in the evaluation process to determine the extent of the claimant's limitations and, given those impairments, whether jobs exist the claimant can perform. *Id.* at §§ 404.1520(a)(4)(iv), (v); *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). The listings include over a hundred conditions SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a); *Sheeks*, 544 F. App'x at 641. The listings work to "streamline the decision process," shifting the focus onto the claimant's impairment and away

---

1997) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

from the ability to work. *Sheeks*, 544 F. App'x at 641 (quoting *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)).

When evaluating whether a claimant's impairment meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant Listing], and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). To obtain remand, a claimant must do more than question the ALJ's decision; the claimant "must show that the open question is a *substantial* one that justifies a remand." *Id.* (emphasis in original).

At issue are the Paragraph B criteria for Listings 12.04 (depressive, bipolar, and related disorders) and 12.10 (autism spectrum disorder). (Pl.'s Br., ECF #14, PageID 430-31). The Paragraph B criteria is the same for both Listings:

> B.      Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
>     1.      Understand, remember, or apply information.
>
>     2.      Interact with others.
>
>     3.      Concentrate, persist, or maintain pace.
>
>     4.      Adapt or manage oneself.

20 C.F.R. § 404, Subpt. P, App'x 1, 12.04B, 12.10B. The Paragraph B criteria is used in conjunction with a five-point rating scale to determine the degree of a claimant's limitations and whether the claimant can use each of the paragraph B areas of mental functioning in a work setting. *Id.* at 12.00F(1). The five-point rating scale evaluates whether a claimant has no, mild, moderate, marked, or extreme limitations due to their mental disorders:

a.   *No limitation (or none).* [The claimant is] able to function in this area independently, appropriately, effectively, and on a sustained basis.

b.   *Mild limitation.* [The claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

c.   *Moderate limitation.* [The claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

d.   *Marked limitation.* [The claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e.   *Extreme limitation.* [The claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis.

*Id.* at 12.00F(2).

Ms. Sharpe argues she has an extreme limitation in her ability to interact with others, thereby satisfying the Paragraph B criteria for both Listings. (Pl.'s Br., ECF #14, PageID 431-32). She argues the ALJ's moderate findings were not supported by substantial evidence, and remand is required because the "ALJ parsed the record by highlighting Sharpe's normal activities of daily living while minimizing the acute level of support and assistance required with even the most basic activities of daily living." (*Id.*). Ms. Sharpe further argues the ALJ cherry picked the evidence, ignored the evidence supportive of disability, and did not consider the effects of Ms. Sharpe's combination of psychological impairments. (*Id.* at PageID 433-34).

Here, the ALJ analyzed the Paragraph B criteria and found Ms. Sharpe had moderate limitations in understanding, remembering, and applying information. (Tr. 18). The ALJ described, for example, that Ms. Sharpe's records contained reports of difficulty understanding and needing things "explained in a different way." (Tr. 18). The ALJ noted Ms. Sharpe required an IEP and special education classes due to her autism spectrum disorder, and had confusion with a serial 7 task during the consultative examination. (*Id.*). The ALJ explained, however, that

24

"cognitive testing has consistently revealed average range intellectual functioning, and the claimant did well academically with extremely limited educational supports." (*Id.*). The ALJ also noted that Ms. Sharpe graduated from high school, and was able to cook meals, perform household chores, shop, and engage in hobbies like video games, artwork, writing, and sewing. (*Id.*). In the ALJ's consideration, that evidence supported only moderate findings in understanding, remembering, or applying information. (*Id.*).

The ALJ also acknowledged Ms. Sharpe's difficulty in interacting with others due to her autism spectrum disorder and exacerbated by her depressive disorder. (Tr. 19). The ALJ noted "a history of difficulty with social/peer relationships, as the claimant did not speak in class, demonstrated poor eye contact and overly formal manner of speech, and she had difficulty joining activities, working in groups, recognizing the thoughts/feelings of others, making and keeping friends, and contacting teachers with questions." (*Id.*). However, the ALJ also cited evidence showing Ms. Sharpe was "open and talkative with her autism personal coach," was able to shop in stores, socialize with family members, go on dates with her boyfriend, volunteer at a food pantry, and participate in her coaching sessions. (*Id.*). Again, the ALJ considered the evidence and found it pointed only to moderate limitations in the ability to interact with others. (*Id.*).

As for concentrating, persisting, or maintaining pace, the ALJ found only moderate limitations. (*Id.*) The ALJ considered the confusion at completing serial 7s and confidence issues at the consultative examination, in contrast with Ms. Sharpe's intact attention and concentration on examination and her ability to complete IEP goals by their due date. (*Id.*). This evidence, in combination with her activities of daily living, led the ALJ to conclude Ms. Sharpe had only a moderate limitation in her ability to concentrate, persist, or maintain pace. (*Id.*).

Finally, the ALJ found Ms. Sharpe had moderate limitations in the ability to adapt or manage herself due to autism spectrum disorder and depressive disorder. (*Id.*). The ALJ noted Ms. Sharpe's "strong need for routine" and difficulty with social and peer relationships, poor eye contact, difficulty joining activities, and working in groups. (*Id.*). However, the ALJ noted Ms. Sharpe's activities of daily living, and the lack of any indication in the record that Ms. Sharpe had difficulty getting along with educational or behavioral health providers or staff. (*Id.*). Considering all of this information and finding only moderate limitations, the ALJ concluded Ms. Sharpe's mental impairments did not satisfy the Paragraph B criteria. (Tr. 20).

It is apparent the ALJ considered the same body of evidence that Ms. Sharpe says should result in more extreme limitations. The ALJ also considered the effect of Ms. Sharpe's psychological impairments in combination, namely, the interrelation between Ms. Sharpe's autism spectrum disorder and depressive disorder. I find no reason to disturb the ALJ's decision.[7]

## III. Substantial evidence supports the ALJ's RFC findings, and the ALJ did not err in his consideration of the medical opinion evidence.

Although positioned as an RFC claim, Ms. Sharpe argues the ALJ's consideration of the medical opinion evidence was inconsistent with respect to Kelly Bylewski, Ms. Sharpe's autism

---

[7]     Ms. Sharpe's reference to *Elliott v. Comm'r* is misplaced. (Pl.'s Br., ECF #14, PageID 432). She is correct that *Elliott* required remand because the ALJ failed to consider the assistance Mr. Elliott, an individual with autism, required in completing his activities of daily living. *See Elliott v Comm'r of Soc. Sec.*, No. 1:20-CV-345, 2021 WL 2926109, *15 (N.D. Ohio June 29, 2021). Mr. Elliott was unable to complete his testimony at the hearing and his mother testified on his behalf; he required his mother's assistance to take his medications, bathe, brush his teeth, and apply deodorant; he could not cook meals or do housework. *Id.* at *1-*4. Mr. Elliott also had social impairments—impairments which, at times, rendered him unable to respond verbally. *Id.*

I recognize Ms. Sharpe also has social impairments and requires certain assistance, namely, the assistance of an IEP, special education classes in elementary school, and she utilized the assistance of an autism coach. But the facts in her case differ significantly from those in *Elliott*, and thus I do not find that the outcome in *Elliott* is determinative here.

personal coach. (Pl.'s Br., ECF #14, PageID 435-36). She further asserts error with respect to the

ALJ's consideration of Dr. Zeck's conclusions in the consultative examination. (*Id.* at PageID 435-

37). Without directly saying as much, Ms. Sharpe intimates the ALJ should have considered Dr.

Zeck fully persuasive, as his report purportedly supports Ms. Sharpe's extreme limitations in

dealing with others. (*Id.*).

The Commissioner opposes, stating the ALJ did as the regulations direct when evaluating

Ms. Bylewski's notes. (Comm'r's Br., ECF #18, PageID 498). Further, according to the

Commissioner, the ALJ considered the evidence in the record and reasonably found Dr. Zeck's

opinion only partially persuasive, in accordance with controlling regulations. (*Id.* at PageID 496-

98).

Because Ms. Sharpe filed her application after March 27, 2017, her case is evaluated under

the regulations found in 20 C.F.R. § 404.1520c. Under these regulations, the ALJ is to articulate

"how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical

findings in [the] case record." 20 C.F.R. § 404.1520c(b). The regulations define a medical opinion

as "a statement from a medical source about what you can still do despite your impairment(s) and

whether you have one or more impairment-related limitations or restrictions" in the ability to

perform physical demands of work activities, the ability to perform mental demands of work

activities, the ability to perform other demands of work, and the ability to adapt to environmental

conditions. 20 C.F.R. § 404.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical

opinion, is not bound by the "treating physician rule," and is not required to give a treating source

controlling weight. *Id.* at § 404.1520c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL

1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[8] and consistency.[9] *Id.* at § 404.1520c(b). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2), (3).

Although the regulations presented in 20 C.F.R. § 404.1520c eliminate physician hierarchy, deference to specific medical opinions, and assigning controlling (or other) weight to a treating physician's medical opinion, an ALJ must still articulate how the medical opinions were considered and how persuasive they were found. *Houston v. Saul*, No. 1:20-CV-1371, 2021 WL 2635376, at *11 (N.D. Ohio June 25, 2021). The intent of SSA's revised regulations, including those contained in 20 C.F.R. § 404.1520c, was "to re-focus judicial review on the critical issue of whether an ALJ's decision was supported with substantial evidence." *Id.* This Court reviews this articulation of persuasiveness to evaluate whether the ALJ properly considered the factors of supportability and consistency as set forth in the regulations. *Id.*

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d

---

[8]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).
[9]     "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

629, 633 (6th Cir. 2004). An ALJ is to consider all evidence in the record to evaluate the limiting

effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms,

efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors

regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963,

2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to

which the symptoms can reasonably be accepted as consistent with the objective medical and other

evidence in the individual's record." *Id.* An ALJ may rely on the limitations contained in a medical

opinion when forming the RFC, but is not required to adopt all opined limitations, even if the

ALJ finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir.

2015). An ALJ "is only required to incorporate those limitations which he has deemed credible"

and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x

582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial

evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18,

2015). Rather, the ALJ is required only to say enough to allow this Court to trace the path of the

reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

Here, the ALJ considered Ms. Bylewski's statements and noted: "The undersigned did not

provide articulation about the evidence that is inherently neither valuable nor persuasive in

accordance with 20 CFR 404.1520b(c). This includes the conclusion by the claimant's autism

coach, Kelly Bylewski, in August 2019 that the claimant can work, albeit with practice and

repetition." (Tr. 28). Under 20 C.F.R. § 1520b(c), statements on issues reserved for the

Commissioner is "evidence that is inherently neither valuable nor persuasive." Such statements

include whether a claimant is or is not able to work, whether an impairment meets or medically

29

equals a Listing, or statements about a claimant's RFC using agency terminology for functional exertional levels rather than descriptions of the claimant's functional abilities or limitations. *Id.*

The ALJ correctly followed the regulations with respect to Ms. Bylewski's statement regarding Ms. Sharpe's ability to work, because such a determination is one reserved solely to the Commissioner. Even so, the ALJ considered Ms. Bylewski's notes and incorporated the relevant portions into the opinion, as the regulations permit. (*See* Tr. 24). I find no reason to overturn the ALJ's decision here.

With respect to Dr. Zeck's opinion, the ALJ found the opinion only partially persuasive. (Tr. 27). The ALJ explained the opinion was "largely supported" by Dr. Zeck's findings on evaluation, and "somewhat consistent" with the other evidence in the record, namely, Ms. Sharpe's autism spectrum disorder, difficulties with social interaction, and sad, depressed appearance. (*Id.*). The ALJ further explained, however, that the opinion was "not entirely consistent with the remaining evidence of record" confirming Ms. Sharpe's persistent social anxiety and using a personal coach to complete volunteer sessions. (*Id.*). The ALJ also noted the examination was performed when Ms. Sharpe was 17 years old, and therefore used the childhood functional standards. (*Id.*). Dr. Zeck assessed Ms. Sharpe's functional abilities in comparison to similarly aged children, and was not entirely instructive for purposes of her evaluation as an adult. (*Id.*). The ALJ also found the opinion "somewhat vague" and "without specifically defined functional limitations." (*Id.*). In all, the ALJ assessed Dr. Zeck's opinion as only partially persuasive.

The ALJ correctly evaluated Dr. Zeck's opinion and described it in terms of supportability and consistency with the record, as the regulations require. I find no error on which to recommend remand.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disabled child's benefits supported by substantial evidence and recommend the decision be affirmed.

Dated: April 1, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice.** *See United States v. Wandahsega,* **924 F.3d 868, 878-79 (6th Cir. 2019).**